T.C. Memo. 1997-17


UNITED STATES TAX COURT


THE ESCROW CONNECTION, INC., A.K.A. THE ESCROW CONNECTION,
Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15867-94.                    Filed January 8, 1997.


David Roth, for petitioner.

Patrick W. Lucas, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  Respondent determined deficiencies in
petitioner's Federal income tax for taxable years ended July 31,
1989 and July 31, 1990, in the amounts of $160,381 and $140,849,
respectively.  Respondent also determined an addition to tax of
$40,349 under section 6661[1] for taxable year ended July 31, 1989,

_____

[1] All section references are to the Internal Revenue Code in
(continued...)

and an accuracy-related penalty of $28,170 under section 6662(a) for taxable year ended July 31, 1990.

The issues for decision are: (1) The amount that petitioner is entitled to deduct as reasonable compensation to Kathryn Kleindienst; (2) whether petitioner is liable for an addition to tax for 1989; and (3) whether petitioner is liable for an accuracy-related penalty for 1990.

## FINDINGS OF FACT[2]

The Escrow Connection, Inc. (petitioner), is an independent escrow firm, organized in California, with its principal place of business in Palm Springs, California. Kathryn Kleindienst (Kleindienst) formed petitioner in 1983 and began business during 1984. Since incorporation, Kleindienst has been petitioner's sole shareholder and sole officer.

Kleindienst obtained an associate of arts degree in business administration from The College of The Desert. She acquired the skills necessary to be an escrow officer by working as a secretary to an escrow officer for a few years. An escrow officer must be good with numbers and attending to details.

After working as an escrow secretary, Kleindienst was promoted to an escrow officer in 1977, and 2 years later, First

---

[1](...continued)
effect for taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The parties' stipulation of facts, along with attached exhibits, is incorporated by this reference.

Centennial Title hired her to open an escrow office in Palm Springs.  First Centennial Title hired Kleindienst based on excellent recommendations from past employers and her ability to attract clients.  Kleindienst worked for First Centennial Title and its successors until 1984, when she began petitioner's operations.  At that time, petitioner took over the office space and telephone number of Kleindienst's former employer, which went out of business.  Kleindienst also taught two escrow officer courses at The College of The Desert.

During the years in issue, Kleindienst served as petitioner's president, secretary, and chief financial officer and worked as an escrow officer and manager.  In her administrative capacity, Kleindienst oversaw business operations, controlled finances, and provided financial planning.  She supervised personnel, reviewed employee performance, and determined compensation.  In addition, she kept up-to-date with State regulation of the escrow industry and determined when to obtain legal advice in handling escrow transactions.  Kleindienst dealt with client complaints and determined when petitioner should not accept an escrow because of potential problems the escrow may create.  As an escrow officer, Kleindienst handled all types of escrow transactions, including most of petitioner's complex escrows.  She also advised other escrow officers in handling their accounts.  Although Kleindienst could not estimate the hours she spent at each function, she spent the majority of

her time working as an escrow officer. In total, Kleindienst worked about 70 hours per week.

In addition to her work as an executive and escrow officer, Kleindienst held seminars and met with realty boards, realtors, real estate developers, attorneys, and accountants to promote petitioner's business. Kleindienst estimated that she solicited escrows that generated approximately $1.2 million of petitioner's $1.46 million in gross receipts during each of the years in issue. Both Lynne West (West), petitioner's accountant, and Kleindienst believed that Kleindienst's services were essential to petitioner's business success. Without the large number of escrows she solicited, petitioner would not be a viable business. Kleindienst's clients have generally followed her when she changed firms. This factor makes Kleindienst more valuable.

Petitioner's gross receipts consisted solely of fees generated from closing escrow transactions. To close an escrow, an escrow officer must collect the purchase price and transfer ownership of the property to the transferee. Not all escrows that are originated are closed; about 75 percent of escrow accounts close. Petitioner did not receive any fee when a client opened an escrow. The average escrow closing generated an $800 fee, but petitioner has received fees as large as $20,000 for closing an escrow.

During the years in issue, petitioner employed three to four escrow officers, including Kleindienst. Escrow officers, except

for Kleindienst, received a commission of 10 percent of the escrow fee generated (closing commission) in addition to a base salary. Petitioner reassigned some of the escrows that Kleindienst solicited. The officer handling the reassigned escrow received the 10-percent closing commission. Escrow officers, not including Kleindienst, closed escrows generating gross receipts of $877,795 and $778,144 during the years in issue, respectively. Kleindienst closed escrows generating gross receipts of $588,523 and $684,099, respectively.

During its first year in business, taxable year ended July 31, 1985, petitioner employed three people and generated gross receipts of $318,963. By 1989 and 1990, petitioner's gross receipts had increased to $1,466,318 and $1,462,243, respectively, and petitioner employed 22 and 24 people, respectively, including Kleindienst, the other escrow officers, and support staff. In part, petitioner's success resulted from a favorable economy during the late 1980's. Economic conditions may have a profound effect on the performance of the escrow industry. From the 1984 beginning of petitioner's escrow business, there were six escrow firms in the Palm Springs area.

Despite the substantial increase in gross receipts, net income before taxes was $100,212 and $10,867, for 1989 and 1990, respectively. During the years in issue, petitioner's profit margin, measured as ratio of net income before taxes over gross receipts, was 6.8 percent and .7 percent, respectively.

Petitioner's witness, Larri E. Jones (Jones), an executive vice president of a title insurance company with an escrow practice, would be satisfied with a 10-percent profit margin.

Petitioner did not pay dividends from 1984 through 1988, and in 1989 and 1990, it paid $3,000 and $3,250 in dividends, respectively. Petitioner did not pay dividends before 1989 to build up retained earnings. Petitioner allowed retained earnings to accumulate to guard against possible slowdowns in the escrow industry and to satisfy government liquidity requirements. Accumulating retained earnings is a normal practice in the escrow industry, especially for startup firms. Shareholder equity increased from $20,000 (Kleindienst's initial capital investment) to $341,708 by 1989. Shareholder equity decreased in 1990 to $338,458, and petitioner's net income after taxes was $0. Kleindienst received compensation in the following amounts:

| Year Ended July 31 | Total Compensa- tion | Base Salary | Bonus | Gross Receipts | Percent of Gross Receipts (%) |
|---|---|---|---|---|---|
| 1984 | 0 | 0 | 0 | 0 | N/A |
| 1985 | $109,250 | $39,250 | $70,000 | $318,963 | 34.25 |
| 1986 | 189,346 | 53,250 | 136,096 | 496,169 | 38.16 |
| 1987 | 364,755 | 94,250 | 270,505 | 830,557 | 43.92 |
| 1988 | 390,000 | 155,000 | 235,000 | 1,101,072 | 35.42 |
| 1989 | 584,710 | 240,000 | 344,710 | 1,466,318 | 39.88 |
| 1990 | 564,800 | 300,000 | 264,800 | 1,462,243 | 38.63 |

In 1989 and 1990, Kleindienst's compensation as a percentage of taxable income before deducting her compensation was 85 percent and 98 percent, respectively.

Petitioner did not have a written employment agreement with Kleindienst or a stated formula for determining her compensation.

She did not receive the 10-percent escrow closing commission for escrows she personally closed. Nor did she receive a stated percentage of the fees generated from escrows that she solicited. Kleindienst determined the amount of her own compensation, as well as the compensation for petitioner's other employees, with the assistance of West and Kleindienst's husband. They based Kleindienst's salary and bonuses on current and anticipated revenue, the percentage increase in gross revenue, Kleindienst's compensation as a percentage of gross revenue, and the amount of earnings petitioner desired to retain, as well as Kleindienst's skill, hours, and the number of escrows she solicited and closed. Petitioner set Kleindienst's base salary at the beginning of each fiscal year and paid her bonuses throughout the year. Petitioner did not have a pension or profit-sharing plan for any of its employees.

Kleindienst set compensation for petitioner's other employees in the same manner that she determined her own compensation. Petitioner paid each employee, besides Kleindienst, a salary and a bonus at the end of the calendar year. The amount of the bonus depended on the employee's position and length of employment and ranged from about $110 to $1,200.[3] In addition, it paid the escrow officers the 10-percent closing commission on escrows they closed. For the year ended

---

[3] One employee received unexplained bonuses throughout taxable year 1989 totaling about $8,600.

July 31, 1989, petitioner paid its 21 employees, other than Kleindienst, a total of $457,291 in salary, commission, and bonuses; for the year ended July 31, 1990, petitioner paid its 23 employees, other than Kleindienst, a total of $485,306. Thus, Kleindienst's compensation exceeded the combined compensation of petitioner's other employees by $127,419 and $79,494, respectively.

Respondent determined $142,852 and $156,610 as reasonable compensation for Kleindienst for taxable years ended July 31, 1989 and July 31, 1990, respectively, and disallowed petitioner's claimed deductions for the excess. At trial, respondent conceded that compensation of approximately $300,000 per year would be reasonable.

OPINION

Before addressing the reasonableness of Kleindienst's compensation, we consider the admissibility of two stipulated exhibits offered by respondent. The first exhibit is a published survey of owners' compensation; the second is a published survey of executive compensation. Petitioner raised two objections to the exhibits. In the stipulation of facts, petitioner reserved hearsay objections. No testimony at trial involved the exhibits, but respondent relied on the exhibits in its brief. Petitioner did not renew the hearsay objections or discuss them in its initial or reply briefs. Therefore, we consider the hearsay objections reserved in the stipulation of facts abandoned.

Midkiff v. Commissioner, 96 T.C. 724, 734 (1991), affd. sub nom. Noguchi v. Commissioner, 992 F.2d 226 (9th Cir. 1993); Van Heemst v. Commissioner, T.C. Memo. 1996-305.

In its reply brief, petitioner objected to the relevancy of the exhibits. Petitioner contends that the exhibits are irrelevant because respondent conceded to compensation for Kleindienst in an amount greater than the average surveyed compensation from both exhibits. Petitioner did not reserve these relevancy objections in the stipulation of facts as required by Rule 91. Foster v. Commissioner, 80 T.C. 34, 135 (1983), affd. in part and vacated in part 756 F.2d 1430 (9th Cir. 1985). In addition, petitioner's previous hearsay objections do not reserve the relevancy objections to the stipulated exhibits because objections must be specific. United States v. Ruffin, 575 F.2d 346, 355 (2d Cir. 1978). As the relevancy objections raised by petitioner in its reply brief are untimely, we decline to consider them. Pan Am. Acceptance Corp. v. Commissioner, T.C. Memo. 1989-440.[4]

Section 162(a)(1) provides for a deduction for ordinary and necessary business expenses including "a reasonable allowance for

---

[4] Despite our holding that petitioner abandoned its objections, we note that we did not rely on the exhibits. The exhibits did not provide any information specifically about owner or executive compensation in the escrow industry. In addition, the exhibits did not identify whether the owners and executives surveyed performed functions similar to those Kleindienst performed. Thus, the exhibits provide little, if any, guidance as to the value of Kleindienst's services.

salaries or other compensation for personal services actually rendered".  A two-prong test determines deductibility: (1) Whether the amount of compensation is reasonable in relation to services performed, and (2) whether the payment is in fact purely for services rendered.  Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. T.C. Memo. 1980-282; Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362 (9th Cir. 1974), affg. T.C. Memo. 1971-200; sec. 1.162-7(a), Income Tax Regs.  The decision as to the deductibility of compensation generally focuses on the reasonableness of the compensation.  Elliotts, Inc. v. Commissioner, supra at 1245.  Petitioner bears the burden of proving the reasonableness of the compensation.  Rule 142(a); Botany Worsted Mills v. United States, 278 U.S. 282 (1929).

The reasonableness of compensation is a question of fact to be answered by considering and weighing all facts and circumstances of the particular case.  Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7; Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992).  The cases provide a lengthy list of factors that bear on the determination of reasonableness.  Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949); Foos v. Commissioner, T.C. Memo. 1981-61.  No single factor is decisive.  Pacific Grains, Inc. v. Commissioner, supra at 606.  In Elliotts, Inc. v. Commissioner, supra, the Court of Appeals for the Ninth Circuit, to which this

case is appealable, has divided these factors into five categories: (1) The employee's role in the company; (2) an external comparison of the employee's salary with salaries paid by similar companies for similar services; (3) the character and condition of the company; (4) the conflict of interest between the company and the employee; and (5) the internal consistency in the company's treatment of payments to employees. Elliotts, Inc. v. Commissioner, supra at 1245-1248.

A.  Role in the Company

The first category of factors identified by the Court of Appeals concerns the employee's role in the company. Relevant factors include the employee's qualifications, position and duties, hours worked, and the general importance of the employee to the success of the company. Elliotts, Inc. v. Commissioner, supra at 1245; American Foundry v. Commissioner, 536 F.2d 289, 291-292 (9th Cir. 1976), affg. in part and revg. in part 59 T.C. 231 (1972). An employee's superior qualifications and substantial contribution to the employer's extraordinary success may justify a high level of compensation. Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1146 (1980). Petitioner maintains that Kleindienst is the primary reason for petitioner's success while respondent contends that, although she had the skill and experience to successfully manage petitioner, neither her academic achievements nor experience was

extraordinary. We find respondent's stance to be correct but not entitled to much weight.

Kleindienst was highly motivated, productive, and indispensable to petitioner's business. She worked long hours, performed the functions of corporate officer and manager, and spent the majority of the hours as an escrow officer. Kleindienst was a well-qualified escrow officer with 12 years of experience. She handled most of petitioner's complex escrows. Some controversy surrounded the number of escrows that Kleindienst closed, and she believed she closed 850 escrows in 1989. Based on the closing commission they received, the escrow officers other than Kleindienst closed escrows that generated fees of approximately $877,795 and $778,144 during the years in issue. This leaves a possible $588,523 and $684,099 in escrow fees generated from Kleindienst's closings. On average, an escrow transaction generated an $800 fee. This confirms Kleindienst's belief as she would have closed about 735 and 855 escrows, respectively. Although respondents' experts doubted that Kleindienst could close this number of escrows given her administrative responsibilities, Kleindienst's testimony was credible.

Perhaps the most valuable service that Kleindienst provided to petitioner was marketing. She personally solicited escrows that generated $1.2 million of petitioner's approximately $1.46 million gross receipts during each year in issue. Respondent

argues that Kleindienst could not have generated $1.2 million in gross receipts because that would attribute too little fees to the other escrow officers as determined by the amount of commission they received.  Kleindienst, however, did not close escrows generating $1.2 million in fees; she solicited escrows that generated $1.2 million in fees when closed.  Kleindienst created a continuing source of referrals by developing contacts with realty boards, realtors, real estate developers, attorneys, and accountants.  Petitioner assigned some of the escrows that Kleindienst solicited to other escrow officers who, in turn, closed the escrow, generated the fee, and received the 10-percent closing commission.

Kleindienst's efforts to solicit clients played a key role in petitioner's success, and petitioner was substantially dependent on her.  Respondent's expert, Dave Brooks (Brooks), admitted that Kleindienst's role in petitioner's success would justify paying her more.  Nevertheless, limits on reasonable compensation exist even for the most valuable employee.  Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1325 (5th Cir. 1987), affg. T.C. Memo. 1985-267; Rutter v. Commissioner, 853 F.2d 1267, 1272 (5th Cir. 1988), affg. T.C. Memo. 1986-407.

B.  External Comparison

The second category of factors involves a comparison of the employee's salary with salaries paid by similar companies for similar services.  Industry standards for compensation have been

significant in determining reasonable compensation. Owensby & Kritikos, Inc. v. Commissioner, supra at 1330; Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 154-155 (8th Cir. 1974), affg. T.C. Memo. 1973-130; sec. 1.162- 7(b)(3), Income Tax Regs. As Kleindienst performed numerous functions, the relevant comparison is to the salaries of each position she filled. Elliotts, Inc. v. Commissioner, 716 F.2d at 1245.

At trial, both parties presented expert testimony as to what a similar escrow firm would pay for Kleindienst's services. Petitioner called Larri Jones as an expert witness. Jones supervises escrow operations at Chicago Title and determines compensation for escrow officers. Chicago Title pays its escrow officers a base salary of $36,000 to $60,000 plus commission. Jones described three types of commission. The first commission is paid to escrow officers based on escrow fees they generate by closing escrows (closing commission). To earn this commission, an escrow officer must generate fees over a predetermined threshold. Once over the threshold, an officer earns a commission of 25 to 31 percent of the closing fees generated; the exact percentage depends on the officer's responsibilities, such as hiring, overseeing escrow accounts, and marketing. The second commission is earned by an escrow officer who manages escrow operations (management commission). An escrow manager receives an additional 2 to 4 percent of revenue generated by officers under her supervision. The third commission is paid to

salespersons who solicit escrows and equals 10 to 20 percent of revenues generated from escrows they solicited (sales commission). Chicago Title did not pay the sales commission to its escrow officers who solicited and closed their own escrows. Rather, Chicago Title would increase the officers' percentage for the closing commission within the 25- to 31-percent range. Jones also stated that Chicago Title has employee benefits, including retirement and health insurance, of about one-third of an employee's pay.

Jones applied this compensation formula to the revenue figures that petitioner provided. Jones set a base salary for Kleindienst at $60,000 and a threshold for the closing commission of $200,000. Jones determined $310,0000 as Kleindienst's closing commissions based on her having closed escrows which generated $1.2 million in fees and applying a 31-percent commission--the highest possible percentage. Next, Jones stated that he would have to pay the sales commission to the salesperson who solicited the $1.2 million of escrow revenues, so he would be willing to pay Kleindienst an equivalent amount for her marketing efforts. According to this calculation, he would pay Kleindienst more than $500,000 not including the 2- to 4-percent management commission.

Although Jones' opinion provides some insight into the compensation structure of the escrow industry, we decline to accept his methodology in its entirety. Jones' formula would pay Kleindienst a closing commission of 25 to 31 percent. However,

petitioner paid its escrow officers a commission of only 10 percent of the closing fee. Petitioner did not offer any explanation for why its compensation system varied from the one its expert advanced to opine on the reasonable compensation for Kleindienst.

We can accept the general methodology of an expert and reject that expert's ultimate conclusion if the record does not support that conclusion. Rutter v. Commissioner, supra at 1274; Barry v. United States, 501 F.2d 578, 581-583 (6th Cir. 1974). In addition, we can decline to follow the opinion of an expert witness if the opinion is contrary to our own judgment. Barry v. United States, supra at 583.

Not only is Jones's formula inappropriate in this case, his conclusion that he would pay Kleindienst more than $500,000 is suspect for two reasons. First, Jones calculated the closing commission based on the revenues produced from escrows that Kleindienst solicited and not from fees generated from escrows that she closed. Second, Jones stated that he did not pay the sales commission to escrow officers who solicited and closed their own escrows. Yet, Jones stated that he would be willing to pay Kleindienst both the closing and sales commissions. A more appropriate manner of compensation would be to pay Kleindienst the sales commission only on those escrows that she solicited but petitioner reassigned to other escrow officers to close.

Respondent argues that we should not apply Jones' formula because Chicago Title is not an independent escrow firm like petitioner. We find no reason to believe that the compensation structure for an escrow officer in an independent firm would be significantly different from one used in a title insurance company. In addition, respondent concedes that its experts' compensation formulas for independent firms are similar to that described by Jones.

Respondent called as its expert witnesses Dave Brooks and Michael Haas, who collaborated on a report that provided five formulas to determine Kleindienst's compensation. Dave Brooks is president, chief executive officer, and majority shareholder of a multibranch, independent escrow firm that generates an average of $3 million in gross receipts. Michael Haas is an accountant who performed accounting services for 42 independent escrow firms during the years in issue. The five formulas are based on their experience and represent compensation plans common in the independent escrow industry. Each formula assigned an arbitrary amount of $12,000 as compensation for Kleindienst's duties as a corporate officer. The average compensation from the five formulas was $300,000. Respondent conceded this amount as reasonable compensation for Kleindienst.

While two formulas provided by respondent resemble Jones' formula, we are not satisfied that respondent's proffered formulas accurately reflect the value of Kleindienst's marketing

services to petitioner.  These two formulas advanced by respondent's experts awarded Kleindienst a 5-percent marketing commission on escrows she solicited but petitioner reassigned. Brooks stated that he may pay an employee more if she solicited a substantial portion of escrow revenues as Kleindienst did. Without Kleindienst, petitioner would have far fewer clients and would most likely be unsuccessful.  However, Brooks did not take this into account when determining Kleindienst's compensation. Brooks explained that the nature of the escrow industry means that an employer loses clients when any employee leaves. Brooks' explanation does not justify ignoring or diminishing the value of the significant contribution that Kleindienst made to petitioner by soliciting the large majority of its escrow clients.

In addition to providing the compensation formulas, Haas also provided corporate officer compensation as a percentage of gross receipts for 28 independent escrow firms.  The average percentage was 22 percent during the years in issue.  Haas stated that most of these corporate officers also worked as escrow officers, and Haas used the total compensation received for both the executive and escrow duties to calculate the percentage.  Haas also provided specific examples of the compensation paid to shareholder-employees of two independent escrow firms.  In both firms, the shareholder worked as a corporate officer and escrow officer.  Although we can compare

the officer compensation and gross revenue of these firms with that of petitioner, we do not know how much the officers of these other firms contributed to the success of their businesses, the percentage of escrows they solicited and handled, or the hours they worked. Thus, any comparison would be of limited assistance in our evaluation of the value of Kleindienst's services.

Petitioner argued that we should assign $220,000 as compensation for Kleindienst's administrative services, rather than the arbitrary $12,000 assigned by Brooks and Haas because Brooks' firm paid $220,000 to its corporate officers. We agree that Brooks and Haas arbitrarily allocated $12,000 for Kleindienst's compensation as an executive and manager. However, $220,000 compensation would be too high. Brooks' firm generated more than two times the gross revenues of petitioner. Also, the officers' compensation at Brooks' firm included payment for soliciting about 25 percent of the firm's escrow clients, which generated over $750,000 in revenue. Petitioner, however, argues that Kleindienst should receive compensation for soliciting clients in addition to her compensation for her administrative duties. Because of these differences, we find that the amount of officer compensation paid by Brooks' firm does not support equivalent compensation for Kleindienst's executive responsibilities.

C.  Character and Condition of the Company

The third category of factors provided by Elliotts, Inc. v. Commissioner, 716 F.2d 1241 (9th Cir. 1983), concerns the character and condition of the company.  Important considerations are the size of the company, as indicated by gross sales, net income, or capital value, general economic conditions, and the complexities of the business.  Elliotts, Inc. v. Commissioner, supra at 1246.  The success of the business provides a basis for increases in compensation.  Summit Publishing Co. v. Commissioner, T.C. Memo. 1990-288.

Petitioner's gross receipts grew from $318,963 in 1984, its first year in operation, to over $1.46 million in 1989 and 1990. Petitioner's shareholder equity increased from an initial investment of $20,000 to $341,708 in taxable year 1989.  The growth in gross receipts and shareholder equity provides clear evidence that Kleindienst was dynamic and effective.  However, we find it somewhat telling that petitioner's net income after taxes remained low.  For the years in issue, net income after taxes was $72,000 and $0, respectively, while it was $40,169 after 1 year in business and reached a peak of $93,546 in taxable year ended July 31, 1988.

In addition, Kleindienst is not the sole reason for petitioner's substantial increase in gross receipts.  Favorable economic conditions during the years in issue also played a role

in petitioner's growth and lessened the credit due to Kleindienst for petitioner's success. Although the economy positively influenced petitioner's success, the record does not permit us to quantify the extent it affected petitioner's success.

D. Conflict of Interest

The fourth category identified by the Court of Appeals for the Ninth Circuit concerns the relationship between the company and the shareholder-employee possibly permitting nondeductible corporate distributions of profits to be paid as deductible compensation. Elliotts, Inc. v. Commissioner, supra at 1246. A potential for such abuse exists when the employee whose compensation is in issue is the company's sole or controlling shareholder. Charles Schneider & Co. v. Commissioner, 500 F.2d at 152; sec. 1.162-7(b)(1), Income Tax Regs. Respondent correctly contends that Kleindienst controlled the amount of her own compensation as she was the sole shareholder and sole corporate officer. In such a situation, we must carefully scrutinize the reasonableness of the compensation. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1324; Charles Schneider & Co. v. Commissioner, supra at 152. Other factors that point to a conflict of interest include compensation that equals a disproportionately large percentage of gross income or pretax net income, large bonuses to shareholder-employees but

not to nonshareholder-employees, and the absence of dividends. Elliotts, Inc. v. Commissioner, supra at 1246; Nor-Cal Adjusters v. Commissioner, 503 F.2d at 362.

Respondent argues that petitioner's dividends of $3,000 and $3,250 were "de minimis" in comparison to Kleindienst's bonuses of $344,710 and $264,800 during the years in issue, respectively. The negligible amount of dividends here is suspicious. Owensby & Kritikos, Inc. v. Commissioner, supra at 1324. However, this alone is not determinative, and valid business reasons could exist for not paying dividends. Id.; Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 714 (1977). At least one court has relied on the absence of dividends to find compensation unreasonable despite the taxpayer's assertion that there were legitimate business reasons for not paying them. Rutter v. Commissioner, 853 F.2d at 1273. The court reasoned that the corporation's failure to pay dividends could not be justified in light of the large bonuses the corporation paid its shareholder-employee.

In this case, petitioner presented legitimate business reasons for not paying dividends. Yet, petitioner paid substantial bonuses to Kleindienst despite the purported need to retain earnings. Although we do not second-guess petitioner's reasons for not paying dividends, the trivial amount of

dividends it paid does not sit well for petitioner in light of the other factors that support a conflict of interest.

Rather than focusing on the payment of dividends, the Court of Appeals for the Ninth Circuit evaluated the reasonableness of compensation from the viewpoint of a hypothetical independent investor. A return on shareholder equity, after paying officer compensation, that would satisfy an independent investor is a strong indication that the compensation is reasonable and that the company is not siphoning off profits disguised as salary. Elliotts, Inc. v. Commissioner, supra at 1247.

Petitioner argued that it provided a sufficient return measured by the dividend paid in each year in issue as a percentage of Kleindienst's initial capital contribution. Such a percentage is not a correct measure of a shareholder's return on investment because it ignores the past earnings retained and reinvested by the corporation which, in this case, constitute a large percentage of shareholder equity. During taxable years ended July 31, 1989 and July 31, 1990, petitioner reported shareholder equity[5] of $341,708 and $338,458, respectively. During these years, net income after Kleindienst's compensation and taxes was $72,681 and $0, respectively--a return of 21

[5] To calculate shareholder equity, we added together the listed amounts for capital stock and unappropriated retained earning from Schedule L on Form 1120, U.S. Corporation Income Tax Return.

percent and no return, respectively.  Although a rate of return on equity of 21 percent could satisfy an independent investor, no return would not.  In addition, Jones stated that, as an investor, he would be satisfied with a 10-percent profit margin, measured as a ratio of net income before taxes over gross receipts.  During the years in issue, petitioner's profit margin was 6.8 percent and .7 percent, respectively.  We find respondent's contention of an inadequate return to be probative here.

Respondent points out that petitioner paid Kleindienst nearly all of its net income before deducting officer compensation and taxes.  Respondent asks us to focus on the time of year that petitioner declared and paid Kleindienst's bonuses.  Payment of bonuses at the end of the year when the corporation knows its revenue for the year may enable it to disguise dividends as compensation.  Owensby & Kritikos, Inc. v. Commissioner, supra at 1329; Estate of Wallace v. Commissioner, 95 T.C. at 556.  Here, however, petitioner paid Kleindienst the bonuses throughout the year and only declared the amount at the end of the year.  Thus, the timing of the bonuses does not indicate unreasonableness.  On the other hand, the fact that petitioner paid nearly all of its pretax earnings as compensation to Kleindienst is detrimental to petitioner here. Estate of Wallace v. Commissioner, supra at 556.

The escrow industry is service-oriented and relies heavily on commission as compensation. Kleindienst was the primary source of solicited escrows and also generated a significant percentage of closing fees as compared to petitioner's other escrow officers combined. As a result, her compensation as a percentage of net income would logically be high. However, we are apprehensive about the fact that Kleindienst's compensation is an extremely high percentage of net income before deducting her compensation and taxes, 85 percent and 98 percent, respectively. In addition, Kleindienst admitted that she based the amount of her bonuses, in part, on the amount of earnings she wanted petitioner to retain. Thus, we conclude that Kleindienst's compensation was based on factors other than the value of her services to petitioner.

E. Internal Consistency

The fifth category of factors provided by the Court of Appeals in Elliotts, Inc. v. Commissioner, 716 F.2d 1241 (9th Cir. 1983), is the internal consistency of the company's treatment of payments to employees. Compensation to shareholder-employees can prove to be unreasonable when compared to compensation paid to nonshareholder-employees of the same company with similar responsibilities. Home Interior & Gifts, Inc. v. Commissioner, 73 T.C. at 1159. On the other hand, if a corporation pays salaries at the top of its industry to all of

its employees, both shareholders and nonshareholders, it may be able to justify a higher compensation level to its shareholder-employees. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1324. In addition, a longstanding, consistently applied compensation plan indicates that compensation is reasonable. Elliotts, Inc. v. Commissioner, supra at 1247.

Petitioner paid bonuses to all employees, but petitioner did not pay bonuses to its nonshareholder escrow officers in a manner consistent with which it paid Kleindienst. Petitioner paid its escrow officers a closing commission of 10 percent of fees from escrows that they closed. Expert witnesses from both parties stated that escrow officers commonly make about one-third of the closing fees as commission. Petitioner never explained why its compensation plan for its escrow officers differed from the industry norm. These officers also solicited escrows without additional commission. In total, petitioner's other escrow officers received salary, commission, and bonuses of $218,763 and $248,091, while Kleindienst made $584,710 and $564,800 during the years in issue, respectively. In addition, Kleindienst's compensation exceeded the combined compensation of all of petitioner's other 21 employees by $127,419 in taxable year 1989 and its other 23 employees by $79,494 in taxable year 1990. The disparity between Kleindienst's compensation and that of the nonshareholder escrow officers is patently glaring

regardless of Kleindienst's additional functions as a corporate officer and manager.

Petitioner contends that it had a longstanding and consistently applied compensation plan. Compensation as a percentage of gross receipts that is within the range of percentages from previous years indicates an informal, consistently applied compensation plan. L&B Pipe & Supply Co. v. Commissioner, T.C. Memo. 1994-187; Mortex Manufacturing. Co. v. Commissioner, T.C. Memo. 1994-110. Petitioner did not use a predetermined formula to calculate Kleindienst's base salary or bonus. Rather, each year Kleindienst met with petitioner's accountant to determine her salary from a stated list of subjective criteria. Kleindienst's compensation rested completely within her own discretion. Thus, we attach little weight to the fact that Kleindienst's compensation as a percentage of gross revenue during the years in issue fell within the range of percentages from prior years.

Based on these considerations, we find that reasonable compensation for Kleindienst for taxable years ended July 31, 1989 and July 31, 1990, is $450,000 and $460,000, respectively. To the extent that arguments of each party were not addressed herein, we find them to be without merit.

### Addition to Tax Under Section 6661

Respondent determined an addition to tax of $40,349 under section 6661 for taxable year ended July 31, 1989. Section 6661(a) imposes an addition to tax of 25 percent of the amount of any underpayment attributable to a substantial understatement of tax. An understatement is the difference between the amount required to be shown on the return and the amount actually shown on the return and is substantial if it exceeds the greater of (1) 10 percent of the tax required to be shown on the return for a taxable year, or (2) $10,000. Sec. 6661(b)(1) and (2)(A); Tweeddale v. Commissioner, 92 T.C. 501, 505 (1989). The amount of the understatement can be reduced if substantial authority existed for the taxpayer's tax treatment of the item in dispute or if the taxpayer adequately disclosed relevant facts regarding the taxpayer's treatment of the item in the return or in a statement attached to the return. Sec. 6661(b)(2)(B). The taxpayer has the burden of proving it is not liable for the addition to tax. Rule 142(a). Petitioner does not contend that substantial authority existed for its position or that it adequately disclosed the relevant facts.

Rather, petitioner maintains that it had reasonable cause for the understatement. Section 6661(c) provides that the Commissioner may waive the addition to tax if the taxpayer proves that reasonable cause existed for the understatement and the taxpayer acted in good faith. The most important factor in

determining whether reasonable cause exists is the extent of the taxpayer's efforts to ascertain its proper tax liability.  Sec. 1.6661-6(b), Income Tax Regs.

Our role with regard to a waiver of the addition is only to determine whether respondent abused her discretion for failing to waive the addition.  Cramer v. Commissioner, 101 T.C. 225, 256 (1993), affd. 64 F.3d 1406 (9th Cir. 1995); Mailman v. Commissioner, 91 T.C. 1079, 1082-1083 (1988); Sisson v. Commissioner, T.C. Memo. 1994-545, affd. without published opinion ___ F.3d ___ (9th Cir., Dec. 17, 1996).  Petitioner must show that respondent's refusal to waive the addition is arbitrary, capricious, or without sound basis in fact.  Cramer v. Commissioner, supra at 256.  Taxpayers should make a specific request for a waiver to later challenge the failure to waive as an abuse of discretion because without this request the Commissioner did not exercise any discretion.  McCoy Enters., Inc. v. Commissioner, 58 F.3d 557, 563 (10th Cir. 1995), affg. T.C. Memo. 1992-693; Chin v. Commissioner, T.C. Memo. 1994-54; Dugow v. Commissioner, T.C. Memo. 1993-401, affd. without published opinion 64 F.3d 666 (9th Cir. 1995); Estate of Reinke v. Commissioner, T.C. Memo. 1993-197, affd. 46 F.3d 760 (8th Cir. 1995); Klieger v. Commissioner, T.C. Memo. 1992-734.  If a taxpayer never asks the Commissioner to waive the addition, it is difficult to fault the Commissioner for failing to waive it.

Estate of Reinke v. Commissioner, 46 F.3d at 765.  In this case, the record contains no indication that petitioner specifically requested that respondent waive the addition prior to trial.

Even if it had requested a waiver, petitioner did not prove reasonable cause existed for its compensation deduction. Petitioner asserts that it reasonably relied on the no-change result from an audit regarding Kleindienst's compensation for taxable year 1987 in determining Kleindienst's compensation for taxable year 1989.  In taxable year ended July 31, 1987, Kleindienst earned $364,755.  In a letter to the Internal Revenue Service (IRS) in response to the audit, West justified Kleindienst's compensation as a percentage of petitioner's gross receipts.  During taxable years 1985-87, the percentage ranged from 34 percent to 44 percent.  West stated that she believed that the no-change result of the audit meant that the IRS approved of compensation to Kleindienst as a percentage of gross receipts within this range.

The no-change result of a prior audit does not mean that respondent approved the manner in which petitioner determined Kleindienst's compensation or that her compensation in taxable year 1987 was reasonable.  Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1329.  In Owensby, the court held that the prior audit result is not decisive in determining the reasonableness of compensation for a subsequent year.  However,

the court stated that reliance on the compensation practice previously allowed by the Commissioner may show good faith. Id. at 1329. The prior audit may, in some circumstances, provide reasonable cause for an understatement and support a waiver of an addition to tax. See Matthews v. Commissioner, 92 T.C. 351, 362-363 (1989), affd. 907 F.2d 1173 (D.C. Cir. 1990).

We find that petitioner's reliance on the prior audit in this case does not provide reasonable cause for its excessive officer's compensation deduction. Petitioner should have been aware, especially with the involvement of an accountant, that the IRS could have decided not to pursue a deficiency for the prior year for a number of reasons, in addition to the possible weakness of its case. The prior audit could have served as a warning to petitioner as to the legality of characterizing the entire amount of payments to Kleindienst as compensation. See Burke v. Commissioner, 929 F.2d 110, 113 (2d Cir. 1991), affg. in part and revg. in part T.C. Memo. 1989-671. In addition, Kleindienst's compensation increased by 60 percent after the year audited. This significant change in the amount of Kleindienst's compensation made it unreasonable for petitioner to rely on the result of the prior audit. Also, petitioner did not prove the extent to which it relied on the no-change result as it considered a number of other factors in determining Kleindienst's compensation. Thus, petitioner did not prove

reasonable cause for its deduction of the excessive compensation.

To avoid liability for the addition to tax, petitioner further argues that it relied on the advice of its accountant, West. Reliance upon the advice of an attorney or accountant constitutes a showing of reasonable cause and good faith only if it was reasonable to rely on the advice under the circumstances. Vorsheck v. Commissioner, 933 F.2d 757, 759 (9th Cir. 1991); sec. 1.6661-6(b), Income Tax Regs. For reliance on professional advice to be reasonable, the taxpayer must supply the accountant with accurate information and the error in the return must be due to the accountant's mistake. Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987); Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978). The experience and sophistication of the taxpayer affect the reasonableness of its reliance on a professional. Vorsheck v. Commissioner, supra at 759.

In this case, Kleindienst, petitioner's representative, is a sophisticated and experienced businesswoman well aware of the prior audit and the uncertainty of the legality of the compensation deduction for taxable year ended July 31, 1987. Kleindienst not only participated in the compensation determination but also had the final authority to set her own compensation. Petitioner did not prove that the deficiency

resulted from the accountant's mistake.  Therefore, we find that petitioner's reliance on West does not protect it from an addition to tax under section 6661.

Given these considerations, we find that respondent did not abuse her discretion by not waiving the addition to tax.  No reasonable cause existed for the understatement despite West's purported reliance on the prior audit and petitioner's purported reliance on West.  Regardless, petitioner failed to request that respondent waive the addition to tax.  We hold petitioner liable for an addition to tax under section 6661 for taxable year ended July 31, 1989.

### Accuracy-related Penalty Under Section 6662

Respondent determined an accuracy-related penalty of $28,170 under section 6662(a) for taxable year ended July 31, 1990.  Section 6662(a) imposes a penalty in an amount equal to 20 percent of the portion of the underpayment of tax attributable to (1) negligence or disregard of the rules or regulations or (2) any substantial understatement of income tax. Sec. 6662(b)(1) and (2).  The definition and the calculation of a substantial understatement under section 6662(d) are similar in most respects to section 6661.  The section 6662(a) penalty does not apply to any portion of an underpayment for which reasonable cause exists and the taxpayer acted in good faith. Sec. 6664(c)(1).  The taxpayer bears the burden of proving that

it is not liable for the accuracy-related penalty.  Rule 142(a);
<u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933); <u>Neely v.
Commissioner</u>, 85 T.C. 934, 947 (1985).

As petitioner substantially understated its income for
taxable year ended July 31, 1990, it is liable for the accuracy-
related penalty.  For the reasons stated above, reasonable cause
for petitioner's excessive compensation does not exist.  In
addition, petitioner did not act in good faith in taxable year
1990.  Petitioner paid Kleindienst excessive compensation,
including large discretionary bonuses, and left no net income
after taxes.  Also, Kleindienst improperly considered the amount
of earnings she wanted petitioner to retain as a factor in
determining her own compensation.  Thus, we find petitioner
liable for an accuracy-related penalty under section 6662(a).

<u>Decision will be entered
under Rule 155.</u>